George B. Petite v. Commissioner.
Petite v. Commissioner
Docket No. 66012.
United States Tax Court
T.C. Memo 1958-143; 1958 Tax Ct. Memo LEXIS 82; 17 T.C.M. (CCH) 725; T.C.M. (RIA) 58143; July 25, 1958
*82 1. Held, respondent properly reconstructed petitioner's income by use of the net worth method for each of the years 1942 through 1947, and the deficiencies determined thereby are sustained. 2. Held, petitioner's income tax returns were false and fraudulent for each of the years 1942 through 1947, and a part of each deficiency was due to fraud with intent to evade tax. R. Carleton Sharretts, Jr., Esq., 1427 Munsey Building, Baltimore, Md., for the petitioner. William Schwerdtfeger, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax, and additions to tax under section 293(b), Internal Revenue Code of 1939, as follows: Addition to Tax
Year
Deficiency
Under Sec. 293(b)
1942
$ 2,895.01
$ 1,447.51
1943
7,437.47
3,718.74
1944
2,107.36
1,053.68
1945
7,764.74
3,882.37
1946
1,446.45
723.23
1947
789.57
394.79
Total
$22,440.60
$11,220.32
There are two issues involved: First, whether respondent correctly determined deficiencies in petitioner's income tax for each of the years 1942 through 1947; and second, whether petitioner filed *83 false and fraudulent income tax returns with intent to evade tax for each of the years 1942 through 1947. Findings of Fact Some of the facts are stipulated, the stipulation being incorporated herein by this reference. George B. Petite (hereinafter referred to as petitioner) is an individual residing in Baltimore, Maryland. The returns for the period here involved were filed with the then collector of internal revenue at Baltimore. Petitioner was born George Kotsatos on September 18, 1902, on the island of Chios, Greece. He emigrated from Greece in 1913 and became a naturalized citizen of the United States in 1922. After entering this country he officially had his name changed to George B. Petite. Petitioner graduated from Temple University in 1922, from Brooklyn Law School in 1926, and was admitted to the bar of Maryland in 1929. He has been actively engaged in the practice of law at Baltimore since 1929. Most of petitioner's clients are of foreign descent. During the years 1939-1948 much of his practice involved handling wage disputes for seamen arriving in Baltimore and other ports. Iris Sipes worked as secretary for the petitioner and two other lawyers from March 1941 *84 to December 1943. During these years Greek seamen came to petitioner's office fairly regularly. Some seamen came for general legal services. Iris Sipes typed many receipts for money left in escrow with the petitioner by seamen for the duration of the war or sooner. Petitioner filed Federal income tax returns for each of the years 1942 to 1947, inclusive, reporting net income or loss as follows: Net Income
Year
(or Loss)
1942
($2,307.86)
1943
(1,167.31)
1944
(1,823.28)
1945 original return
3,070.57
amended return
2,625.13
1946
2,487.64
1947
2,515.51
An investigation of petitioner's affairs was begun by the respondent in early 1948. Special Agent Carney had at least ten meetings with the petitioner before May 5, 1950. At these meetings the nature of a net worth statement was discussed in detail. A net worth statement was submitted by the petitioner prior to May 5, 1950. The balance sheet of this statement appears below: Taxable
Taxable
Assets
Year 1941
Year 1948
Cash
$ 2,200.21
$ 3,051.01
Notes and accounts re-
ceivable
5,000.00
8,052.61
Investments
10,500.00
36,666.66
$17,700.00
$47,770.28
Liabilities
Notes and mortgages
payable
$11,000.00
$ 3,854.35
*85 Petitioner also submitted to the internal revenue agents an affidavit concerning his financial background dated May 3, 1949. The pertinent provisions of this affidavit are as follows: "I reside at 4611 Walther Boulevard and have an office at 214 E. Lexington Street, Baltimore, Maryland. I came to Baltimore in 1926 and was employed as a law clerk from that time until 1929 at which time I was admitted to the Bar of Baltimore City. I have practiced law in this city since that time. "When I arrived in Baltimore in 1926 I was worth approximately between $9,500.00 and $10,500.00, which included a parcel of land located at 206 W. 2nd Street, Chester, Pennsylvania. "From 1929 until the present time my only sources of income were from the practice of law, and more recently from 1943 to date rental income in addition to my law practice. At no time from 1926 until the present time have I ever had more than $2,000.00 undeposited cash on hand. "I wish to state that I have never inherited any money and the only gifts of money I ever received between the years 1926 and 1931 were a graduation present and a wedding present from a Miss Annie Wilson of $1,800.00. I have no property or assets *86 of any kind, whether real, personal or mixed, in any foreign country or in any other State outside of the State of Maryland, nor does any person, firm or corporation hold for me or in my behalf any property whatsoever, either within the State of Maryland or elsewhere, except such property as my wife may hold jointly with me as tenants by the entireties. I have never had nor have I now any safe deposit box in any bank or financial institution. Between the years of 1918 and 1929, I made a number of accommodation loans to friends and acquaintances and a major part of these loans were repaid to me between the years of 1941 and 1948. These receipts, of course, were not shown on my income tax returns, since it did not represent income but payment of the capital of the said loans." On May 5, 1950, petitioner represented for the first time to internal revenue agents that he was holding money in escrow for Greek seamen. He then claimed the total amount of the escrow monies to be $27,000. At a transcribed meeting on June 2, 1950, a document was introduced by petitioner which purported to list the names of seamen who had left money with petitioner, along with the amounts held for each man, *87 and the ships upon which the men served. This document can be summarized as follows: Amount Held
Ship
In Escrow
S. S. Eugenia Livanos
$ 7,302
S. S. Athenia Livanos
7,285
S. S. Samir
9,490
S. S. Kastor
8,275
S. S. Rinos
4,532
S. S. Gloria
8,860
Miscellaneous
9,837
$55,581
At the trial petitioner introduced a similar schedule showing the total amount held in escrow for the seamen to be $53,236, of which $26,534 was received in 1940 and 1941. Petitioner's records consisted of bank deposit slips, checks, check stubs, client files, a list of properties owned by him showing rents received and expenses, supplement sheets concerning real estate transactions, work sheets used in the preparation of his income tax return, and some diaries kept daily, showing names of clients who had come to see him or telephoned. There were also 107 documents, or photostats of documents, purporting to be receipts from various seamen or members of their families. The usual form of the receipts set forth that the signatory had received from petitioner, or his legal representative Georgios Papadopoulos, monies left with petitioner when the signatory, or a relative, was *88 a member of the crew of a ship calling at the port of Baltimore. Three of the crewmen of the "Eugenia Livanos", whose names appear as releasers on such receipts, did not, in fact, ever leave any money with the petitioner. The receipts purportedly signed by these men were neither written nor signed by them. Four other crewmen of the "Eugenia Livanos", whose names likewise appear on similar receipts, did not leave any money with the petitioner on the dates indicated in the receipts. Petitioner made a trip to Greece in March 1948. In a letter to the Department of State dated February 24, 1948, requesting a passport, petitioner stated: "I contemplate a trip to Chios, Greece to visit my aged parents. I find my trip necessary at this time because I am informed that my mother is incurably ill, and I am anxious to see her while she is alive. * * *" He was able to see his mother only four or five hours before she died on March 23, 1948. On his 1942 and 1943 Federal income tax returns petitioner claimed $1,200 for office rent as a necessary expense for the production of income. The rent for petitioner's office space in the Munsey Building in Baltimore was $420 for each of the years *89 1942 and 1943. There is no evidence that petitioner maintained any other office during those years. On July 6, 1944, petitioner purchased the real property located at 216 E. Preston Street, Baltimore, Maryland, for $7,070. In connection with the purchase petitioner borrowed $4,000, giving a mortgage on the real estate as security. This mortgage was paid in full when the property was sold on June 17, 1946, for $7,500. After making adjustments for improvements, expenses of sale, and depreciation, he realized a long-term capital gain of $997.32. On his Federal income tax return for 1946 petitioner reported a net loss of over $4,000 on the transaction. From time to time petitioner held in escrow monies of clients or other persons involved in legal matters which petitioner was handling. Thus, on December 4, 1941, he received $200 belonging to James. H. Tangiras. This money was paid out by petitioner in 1942. In 1947 he received $2,965.24 relative to the sale of real estate located at 4706 Custis Avenue, Baltimore, and $753.75 belonging to Evangelos Frangas. Both these sums were paid out by petitioner after December 31, 1947. On January 9, 1947, petitioner wrote a check for $1,000 *90 to the order of George Bournias. This check represented part of a cash bail deposit petitioner was able to obtain for Bournias from a Federal Court at Norfolk, Virginia, in July 1946. Respondent reconstructed petitioner's income for each of the years 1942 through 1947 by means of the net worth method and determined the deficiencies and additions to tax here at issue. A condensation of the net worth statement attached to the notice of deficiency follows: 1941
1942
1943
1944
Assets
Cash in banks
$ 2,305.37
$ 1,967.22
$ 8,995.59
$ 2,956.23
Receivables (loans and
4,675.00
3,952.00
5,105.00
2,679.39
mortgages)
Real estate
12,397.49
35,759.73
49,440.58
63,260.45
Office equipment
65.00
97.50
Automobile (Oldsmobile)
1,165.00
1,165.00
1,165.00
1,165.00
Automobile (Chevrolet)
Mortgage expense account
260.70
255.14
Total assets
$20,542.86
$42,843.95
$65,031.87
$70,413.71
Liabilities and reserves
Loans payable
$ 1,195.00
$ 900.00
Mortgages payable
$10,858.56
18,921.79
25,211.72
$27,106.30
Due Equitable Trust Co.
2,638.04
1,258.04
(F.H.A. loan)
Due Homes, Inc.
1,544.20
1,544.20
1,544.20
Due James H. Tangiras (money
held in
escrow since 12/4/41)
200.00
Funds held in escrow for sale
of property
at 4706 Custis Ave.
Due Evangelos Frangas (funds
held in es-
crow)
Deferred income
Reserves for depreciation
32.92
506.24
1,134.52
2,039.62
Total liabilities and
$11,091.48
$24,805.27
$30,048.48
$30,690.12
reserves
Net worth Dec. 31 - current
$ 9,451.38
$18,038.68
$34,983.39
$39,723.59
year
Net worth Dec. 31 - prior
9,451.38
18,038.68
34,983.39
year
Increase in net worth
$ 8,587.30
$16,944.71
$ 4,740.20
Add unallowable personal
4,594.53
4,844.82
5,313.11
expenditures
$13,181.83
$21,789.53
$10,053.31
Deduct nontaxable income and
allowable medical ex-
pense
15.84
Corrected net income
$13,181.83
$21,789.53
$10,037.47
Net income (or loss) per
(2,307.86)
(1,167.31)
(1,823.28)
returns
Understatement of net income
$15,489.69
$22,956.84
$11,860.75
*91 1945
1946
1947
Assets
Cash in banks
$ 9,222.58
$14,947.23
$10,284.65
Receivables (loans and
4,200.09
5,062.08
9,397.14
mortgages)
Real estate
65,163.08
48,562.90
52,981.40
Office equipment
97.50
398.80
398.80
Automobile (Oldsmobile)
Automobile (Chevrolet)
1,000.00
1,000.00
1,000.00
Mortgage expense account
264.16
280.95
285.56
Total assets
$79,947.41
$70,251.96
$74,347.55
Liabilities and reserves
Loans payable
Mortgages payable
$21,071.37
$ 6,666.81
$ 6,243.77
Due Equitable Trust Co.
(F.H.A. loan)
Due Homes, Inc.
Due James H. Tangiras (money
held in
escrow since 12/4/41)
Funds held in escrow for sale
of property
at 4706 Custis Ave.
2,965.24
Due Evangelos Frangas (funds
held in es-
crow)
753.75
Deferred income
62.00
32.00
Reserves for depreciation
2,589.85
2,752.93
3,548.75
Total liabilities and
$23,661.22
$ 9,481.74
$13,543.51
reserves
Net worth Dec. 31 - current
$56,286.19
$60,770.22
$60,804.04
year
Net worth Dec. 31 - prior
39,723.59
56,286.19
60,770.22
year
Increase in net worth
$16,562.60
$ 4,484.03
$ 33.82
Add unallowable personal
6,504.51
6,729.98
6,957.28
expenditures
$23,067.11
$11,214.01
$ 6,991.10
Deduct nontaxable income and
allowable medical ex-
pense
456.17
2,172.07
475.00
Corrected net income
$22,610.94
$ 9,041.94
$ 6,516.10
Net income (or loss) per
3,070.57
2,487.64
2,515.51
returns
Understatement of net income
$19,540.37
$ 6,554.30
$ 4,000.59
*92 All of the component figures in the net worth statement are stipulated. Petitioner filed false and fraudulent income tax returns for each of the years 1942, 1943, 1944, 1945, 1946, and 1947 with intent to defraud the Government of taxes due. Some part of the deficiency for each of such years is due to fraud with intent to evade tax. The statute of limitations does not bar the assessment and collection of any amounts found to be due in accordance with these findings and opinion. Opinion VAN FOSSAN, Judge: The first issue is whether respondent correctly determined deficiencies in petitioner's income tax for each of the years 1942 through 1947. Respondent reconstructed petitioner's income by means of the net worth method. All of the figures used in the net worth statement were stipulated. Petitioner's income as reconstructed far exceeds income as reported for each of the years in question. Petitioner asserts that respondent's reconstruction of income is error because it fails to make provision for his liability to repay escrow funds totalling approximately $55,581. The petitioner relates that during the war Greek seamen, fearing the consequences of submarine attack, left *93 with him in escrow sums totalling approximately $55,581; that he kept the funds at his office for a time and then used them for living expenses and property repairs; that after the war he went to considerable trouble to locate the seamen, advertising in two Greek newspapers in New York City and also contacting the Greek Government, but to no avail; that in 1948 he went to Greece for the dual purpose of visiting his aged mother who was critically ill and of attempting to locate the seamen who had left the escrow monies with him; that before her death his mother gave to him 4,000 gold coins which had been left with her by petitioner's grandmother, with instructions that they should be held for him; that he then appointed an agent in Greece, where most of the seamen returned, to pay off the escrow liabilities; and that for this purpose he converted the gold coins left to him by his grandmother. In support of his testimony petitioner introduced documents purporting to be photostats of receipts given to him or his agent by various seamen upon the return of money held in escrow. He also introduced a paper which purported to be an affidavit signed by the president and the curate of the *94 community of Courounia, in the Kingdom of Greece, substantiating his claim that he inherited 4,000 gold coins from his grandmother. Contradictions in evidence and testimony make it impossible for us to give credence to this story. An investigation of petitioner's affairs was begun by the respondent in early 1948. It was not until May 5, 1950, after at least ten meetings with a special agent, that petitioner first brought forth the story of the escrow monies. It is difficult to believe that a man of the petitioner's background would not understand the importance of such funds to an accurate reconstruction of his income. When he explained the escrow arrangement to internal revenue agents on May 5, 1950, he claimed the total amount of such funds to be $27,000. On June 2 of the same year he raised this amount to $55,581. Such inaccuracy is inconsistent with his story of extreme efforts to locate the owners of escrow funds. A net worth statement submitted by petitioner during the course of respondent's investigation reveals that as of 1941 he had cash in the amount of $2,200.21, notes and accounts receivable in the amount of $5,000, investments in the amount of $10,500, and liabilities *95 totalling $11,000, yet petitioner claims that he received $26,534 from Greek seamen during 1940 and 1941 alone. At a transcribed conference with internal revenue agents on June 2, 1950, petitioner stated that he kept the money received from the seamen in a file and later invested it. At the trial he testified that he held the escrow monies in his office for a long time and then used it for living expenses and property repair. Obviously the financial statement submitted during the investigation is contradictory to petitioner's later testimony. Three of the seamen whose names appear as releasers on receipts purportedly issued to petitioner or his agent upon the return by him of escrow monies testified that they never left any money with the petitioner and that the receipts bearing their names were neither written nor signed by them. Four other seamen whose names appear on similar receipts deposed that they did not leave any money with the petitioner on the dates indicated on the receipts. This testimony not only marks as fictitious the receipts purportedly signed by the above seamen but also casts the gravest doubts upon the genuineness of all the receipts submitted by petitioner. *96 In a letter to the Department of State dated February 24, 1948, petitioner gave as his only reason for traveling to Greece a desire to visit his aged parents. His mother was incurably ill and he wished to see her before she died. However, during a transcribed conference with internal revenue agents on June 2, 1950, petitioner recounted that he went to Greece for a twofold purpose - to see his mother, whose death was imminent, and to ascertain the whereabouts of people for whom he held money in escrow. Petitioner would have us believe that a few hours before his mother died she gave to him 4,000 gold coins left for him by his grandmother. He attempts to substantiate this story by a document purporting to be an affidavit of the president and curate of the community where his mother lived. In an affidavit executed on May 3, 1949, and submitted to the Internal Revenue Service, petitioner swore, inter alia, that he had never inherited any money and that he had no property or assets of any kind in any foreign country. Clearly, this is in flat contradiction of his story of the gold coins. Even if we assume that petitioner's affidavit of May 3, 1949, was false and that he actually did *97 inherit substantial sums from his grandmother, we are still faced with the proposition that, by petitioner's own testimony, he did not receive the gold coins until the day of his mother's death, March 23, 1948. The last tax year here at issue is 1947. The inherited funds could not possibly account for the discrepancy between the net worth statement and petitioner's income tax returns; they would at most offer an explanation of how the claimed escrow liabilities were repaid in later years. Leaving for a moment the story of the escrow funds held for seamen and turning to petitioner's returns for the years in question, we there find other inconsistencies and inaccuracies. On his income tax returns for each of the years 1942 and 1943 petitioner claimed $1,200 for office rent as a necessary expense for the production of income. An investigation by the State of Maryland Income Tax Division revealed that the annual rental for petitioner's office space in the Munsey Building in Baltimore was $420 during 1942 and 1943. There is no evidence that petitioner maintained any other office during these years. On his Federal income tax return for 1946 petitioner reported a loss of over $4,000 *98 on the sale of property at 216 E. Preston Street, Baltimore. It is stipulated that he realized a capital gain of $997.32 on this sale. The evidence does show that petitioner paid out $1,000 to a client on January 9, 1947. The payment represented part of a cash bail deposit petitioner was able to recover for the client in July 1946. This sum was not included in respondent's net worth computation. The computation should therefore be adjusted to reflect the transaction. It is elementary that the burden of disproving respondent's determination rests upon the petitioner. Here, respondent has determined deficiencies based upon a net worth statement, every component figure of which is stipulated. Respondent also disproved the only explanation put forth by the petitioner for the discrepancy between income as reported and income as reconstructed. Petitioner raises the question of the statute of limitations for the first time on brief. Our findings make discussion of this question superfluous. It might be noted, however, that the issue was not raised in the pleadings; therefore, there was no burden upon the respondent to show an extension of the statutory period. United Business Corp. of America, 19 B.T.A. 809 (1930), *99 affd. 62 Fed. (2d) 754 (C.A. 2, 1933), certiorari denied 290 U.S. 635 (1933). We hold that, excepting the $1,000 item in the years 1946 and 1947 discussed above, petitioner has failed to carry his burden. After adjustment to reflect the aforementioned $1,000, the deficiencies should be sustained. The second issue is that of fraud. This Court stated in the case of M. Rea Gano, 19 B.T.A. 518, 533 (1930), as follows: "Isolated instances of discrepancy or occasional lapses from the rigid accountability contemplated by the law might conceivably be overlooked, but where the whole fabric of petitioner's tax accounting is permeated with gross error, where elaborate artifice is employed to accomplish the end sought, where the evidence adduced in explanation on different occasions varies so as to make it all unreliable, where sworn statements are proven by records to be false, and where the errors both of law and of fact all tend to accomplish a reduction of apparent tax liability, the situation goes beyond mere fortuitous coincidence, or unintentional error. It evidences a purpose to evade. * * *" It would be difficult to find words which more *100 precisely fit the situation at hand. Respondent's reconstruction of petitioner's income is based entirely upon stipulated figures. The petitioner attempts to explain the discrepancy between income as reconstructed and income as reported by his story of escrow monies and inherited gold coins. This explanation was not offered until May 5, 1950. Prior to that time petitioner had met at least ten times with a special revenue agent. When he first presented the story petitioner claimed he was holding $27,000 in escrow monies. Less than a month later he raised this total to $55,581. His affidavit concerning his financial background and the net worth statement submitted by him before May 5, 1950, both contradict his explanation. To substantiate his story petitioner introduced photostats of purported receipts and originals of other purported documents. Some of the receipts were proved false. As stated above, on his 1942 and 1943 income tax returns petitioner claimed a deduction for office rent of $1,200. The only office space which petitioner is shown to have had at that time rented for $420 annually. The acts outlined above can hardly be regarded as evidence of square dealing with the *101 Government. Even were we to believe petitioner's story of the escrow monies, this would account for only $55,581, leaving an unexplained difference of $24,821.54 between income as reconstructed for the years in issue and income as reported. This, in itself, is indicative of fraud. Arlette Coat Co., 14 T.C. 751 (1950). The evidence is clear and convincing that petitioner knowingly understated his income on Federal income tax returns for each of the years 1942 through 1947. When respondent's investigation revealed these understatements, he devised an elaborate explanation and attempted to substantiate it with falsified documents. Such actions evince a continuing willful intent to defraud the Government of tax revenues. Petitioner argues that the respondent failed to comply with the mandate of the Supreme Court in Holland v. United States, 348 U.S. 121, and neither investigated all leads furnished by the petitioner nor established a likely source of the unreported income. The record clearly establishes that respondent went to great lengths to verify petitioner's only explanation, even to the extreme of taking the depositions of various individuals in *102 the Kingdom of Greece. The record also shows that respondent carefully examined what few records petitioner produced. The Supreme Court, in United States v. Massei, 355 U.S. 595, clarified its position in the Holland case, supra, stating: "The Court of Appeals has based its remand in part on the absence of 'proof of likely source,' which it regards as an 'indispensable' element of the net worth method, citing Holland * * *, in support of its conclusion. In Holland we held that proof of a likely source was 'sufficient' to convict in a net worth case where the Government did not negative all the possible nontaxable sources of the alleged net worth increase. This was not intended to imply that proof of a likely source was necessary in every case. On the contrary, should all possible sources of nontaxable income be negatived, there would be no necessity for proof of a likely source." In the case at bar respondent negated the only explanation offered by the petitioner. In the absence of any other verifiable explanation, the logical sources from whence the net worth increases could have sprung were petitioner's law practice and rental business. This is substantiated by his *103 affidavit of May 3, 1949, in which he swore that - "From 1929 until the present time my only sources of income were from the practice of law, and more recently from 1943 to date rental income in addition to my law practice." We hold that respondent did not err in determining additions to tax under section 293(b). Decision will be entered under Rule 50.